UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

NORMAN L. JAMES; TYRONE
BRODHEAD; ALPHONSO A.
LACEY; PAMELA LANCASTER;
and TIMOTHY ROSS,

                        Plaintiffs,

v.

PAUL VAN BLARCUM, in his official                    1:16-CV-1065
capacity as Ulster County Sheriff and in             (GTS/DEP)
his individual capacity; JON BECKER,
in his official capacity as Warden of the
Ulster County Jail, and in his individual
capacity; LOUIS T. RUSSO, Sr., in his
official capacity as Warden of the
Ulster County Jail, and in his individual
capacity; and ULSTER COUNTY,

                        Defendants,

_____

APPEARANCES:                                         OF COUNSEL:

CHARNY & WHEELER                                     NATHANIEL K. CHARNY, ESQ.
   Co-Counsel for Plaintiffs                         RUSSELL G. WHEELER
9 West Market Street
Rhinebeck, New York 12572

BERGSTEIN & ULLRICH, LLP                             STEPHEN BERGSTEIN, LLP
   Co-Counsel for Plaintiffs
5 Paradies Lane
New Paltz, New York 12561

ROMER WALLENS GOLD & MINEAUX LLP                     EARL T. REDDING, ESQ.
   Counsel for Defendants                            BENJAMIN D. HEFFLEY, ESQ.
13 Columbia Circle
Albany, New York 12203

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

Currently before the Court, in this employment civil rights action filed by Norman L. James, Tyrone Brodhead, Alphonso A. Lacey, Pamela Lancaster, and Timothy Ross (collectively "Plaintiffs") against Paul Van Blarcum, in his official capacity as Ulster County Sheriff and in his individual capacity, Jon Becker, in his official capacity as Warden of the Ulster County Jail and in his individual capacity, Louis T. Russo, Sr., in his official capacity as Warden of the Ulster Conty Jail and in his individual capacity, and Ulster County (collectively "Defendants"), is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 38.)  For the reasons set forth below, Defendants' motion for summary judgment is granted.

# TABLE OF CONTENTS

I.     RELEVANT BACKGROUND ............................................................................ 1

    A.   Plaintiffs' Claims .................................................................................. 1

    B.   Statement of Undisputed Material Facts ............................................... 2

    C.   Parties' Briefing on Defendants' Motion for Summary Judgment ......... 30

        1.   Defendants' Memorandum of Law-in-Chief ................................. 30

        2.   Plaintiffs' Opposition Memorandum of Law ................................ 33

        3.   Defendants' Reply Memorandum of Law ..................................... 34

II.    GOVERNING LEGAL STANDARD ......................................................... 35

    A.   Standard Governing a Motion for Summary Judgment ......................... 35

    B.   Standards Governing Plaintiffs' Claims and Defendants' Defenses .......... 38

III.   ANALYSIS ............................................................................................ 38

    A.   Plaintiffs' Disparate-Treatment Claims (Counts One, Four, Six, and Seven)........ 38

        1.   Failure to Promote ...................................................................... 41

        2.   Discriminatory Job Assignments .................................................. 41

        3.   Discriminatory Discipline ............................................................ 41

        4.   Other Allegations ........................................................................ 43

    B.   Plaintiffs' Hostile-Work-Environment Claims (Counts Two and Five) ................. 44

    C.   Plaintiffs' Deprivation-of-Rights Claim (Count Three) ............................. 45

# I.      RELEVANT BACKGROUND

## A.      Plaintiffs' Claims

Generally, liberally construed, Plaintiffs' Amended Complaint alleges as follows.  (Dkt. No. 25.)

Plaintiffs are currently or were previously Correction Officers, employed by the Ulster County Sheriff's Office, and all identify as black.  (*Id.*)  Plaintiffs describe a work environment in which black employees are passed over for promotion in favor of their white counterparts, demoted by their white superiors, provided fewer opportunities for training than their white counterparts, afforded fewer privileges in comparison with their white counterparts, disciplined more severely than are their white counterparts for similar offenses, subjected to racial slurs directed at them and directed at others in their presence by their white counterparts, and are forced out of leadership positions to the extent they ever held such a position to begin with by their white superiors.  (*Id.*)

Generally, based on these factual allegations, the Amended Complaint asserts the following seven claims: (1) a claim of disparate treatment of Plaintiffs by Defendants in their individual capacities in violation of 42 U.S.C. § 1981 ("Count One"); (2) a claim of hostile work environment by Defendants in violation of 42 U.S.C. § 1981 ("Count Two"); (3) a claim of deprivation of rights in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 1983 ("Count Three"); (4) a claim of disparate treatment of Plaintiffs by Defendants in violation of the Fourteenth Amendment and 42 U.S.C. § 1983 ("Count Four"); (5) a claim of a hostile work environment by Defendants in violation of the Fourteenth Amendment and 42 U.S.C. § 1983 ("Count Five"); (6) a claim of disparate treatment of Plaintiffs James, Brodhead, and Lacey by Defendants in violation of 42 U.S.C. § 2000e et seq. (Title VII) ("Count Six"); and (7) a claim of disparate

treatment of Plaintiffs James, Brodhead, Lacey, and Lancaster by Defendants in their individual capacities in violation of the New York State Human Rights Law ("Count Seven").  (*Id.*)  As relief, Plaintiff seeks back pay and front pay or reinstatement, compensatory damages, punitive damages, reasonable costs and attorneys' fees, pre- and post-judgment interest, and further relief as the Court deems just and equitable.  (*Id.*)

### B.     Statement of Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported by Defendants in their Rule 7.1 Statement and not successfully denied by Plaintiffs in a Rule 7.1 Response that both *matched* the paragraphs of Defendants' Rule 7.1 Statement and *specifically cited* the record where the factual issue arises, as required by Local Rule 7.1(c) of the Local Rules of Practice for this Court.  (*Compare* Dkt. No. 38, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 44 [Pls.' Rule 7.1 Response].)

1.     Prior to commencing this action on August 30, 2016, Plaintiffs Norman L. James, Tyrone Brodhead and Alphonso A. Lacey filed a charge of discrimination with the Equal Employment Opportunity Commission on August 24, 2015.

2.     Plaintiff Pamela A. Lancaster filed a charge of discrimination with the Equal Employment Opportunity Commission on February 1, 2016.

3.     Because much of the discovery that Plaintiffs sought in this action related to personal and confidential information of non-party Correction Officers, which is precluded from disclosure by New York Civil Rights Law § 50-a without a court order, the parties entered into a confidentiality/Disclosure Agreement and Order, which was So-Ordered by the Hon. David E. Peebles.

4.      Defendant Paul Van Blarcum is the Sheriff of Ulster County.

5.      Defendant Van Blarcum assumed office as the Ulster County Sheriff in 2007.

6.      Prior to his election as Sheriff, Defendant Van Blarcum was a uniformed Sergeant with the road patrol side of the Sheriff's Office.  He had no supervisory authority within the corrections division from about 1979 until he assumed office as Sheriff.

7.      Defendant Jon Becker is the Warden of the Ulster County jail.

8.      He has worked for the corrections division of the Sheriff's Office since 1989 and, after ascending in rank over the course of his career, was appointed Warden in 2013.

9.      Defendant Becker also commands the Sheriff's Emergency Response Team ("SERT").

10.     SERT is a specialized team created to handle emergency incidents that arise in the jail.  The team is responsible for tasks such as escorting and securing high risk inmates and conducting searches of the facility.

11.     Defendant Becker assumed command of the team in 2003 or 2004, after Plaintiff Norman James declined an opportunity to lead SERT.[1]

---

[1]      Plaintiffs dispute this asserted fact and argue that there is no evidence that Plaintiff James was ever officially offered the position.  However, Plaintiff James gave the following testimony to support the fact asserted:

> Q:      Were you ever offered the *opportunity* to be S.E.R.T. commander?
> A:      Yes.
> Q:      When was that? When Cosenza retired?
> A:      Yes. He came to me and asked me did I want to take over.
> Q:      What did you say to him?
> A:      That I liked the assistant commander position because I liked working with the actual team and doing the tactics and instructing on the tactics that we did and the operations that we would go on and do, and I wanted hands on with.
> Q:      So you turned down the S.E.R.T. commander position in favor of the assistant commander position?
> A:      Yes. . . .

12.     Defendant Becker has been SERT commander continuously since that time, with the exception of approximately 2009 to 2011, during which time he stepped aside pending the outcome of a lawsuit.

13.     Plaintiff James led SERT in Becker's absence.[2]

14.     SERT has approximately 20 members.

15.     In addition to being led by the SERT commander, the team is led by one or two assistant commanders.

16.     Prior to his retirement from the Sheriff's Office on August 30, 2017, Defendant Louis T. Russo, Sr., was a Warden at the Ulster County Jail.  He had held that position since 2014.

## NORMAN JAMES

17.     Plaintiff Norman James has worked for the corrections division of the Ulster County Sheriff's Office since 1988.  He has been employed as a Correction Officer since his hiring.

18.     Plaintiff James testified that he has taken one promotional examination, in or about 1996 or 1997.  Plaintiff James passed that examination and believes he scored around a 75 or 80.

19.     Plaintiff James has never been disciplined in the course of his employment with the Sheriff's Office.

(Dkt. No. 38, Attach. 15, at 66 [emphasis added].)

[2]     While Defendants cite Paragraph 12 of Becker's Declaration in support of this fact, it is both Paragraphs 12 and 13 (as well as Exhibit A to Becker's Declaration) that support this fact.  In addition, the Court noes that Plaintiffs dispute this fact.  (Dkt. No. 44, at ¶ 25.)  However, the citation provided by Plaintiffs does not refute this fact.  (Dkt. No. 38, Attach. 15, at 66.)

20.     Over the course of his employment, Plaintiff James has received numerous awards and commendations.

21.     Plaintiff James currently serves as an instructor within the Sheriff's Office, instructing courses in, among other things, defensive tactics, firearms, baton use, first aid, use of chemical agents and active shooter situations.  He has served in this capacity from about 2000 through the present.

22.     Plaintiff James served as a member of SERT from about 1989 or 1990 through 2015.  Plaintiff James was one of the original members of SERT.

23.     The Sheriff's Office offered Plaintiff James the opportunity to be SERT commander in or around 2004 or 2005.[3]

24.     Plaintiff James turned the opportunity down in favor of serving as the team's assistant commander, and command of the team instead went to Defendant Becker.[4]

25.     As an assistant commander, Plaintiff James was initially responsible for, among other things, helping to lead bi-weekly trainings for SERT members.[5]

26.     Plaintiff James was displeased with the manner in which Defendant Becker commanded SERT.

---

[3]     Plaintiffs provide the same or substantially the same response that was discussed above in note 1 of this Decision and Order.

[4]     Plaintiffs provide the same or substantially the same response that was discussed above in note 1 of this Decision and Order.

[5]     Plaintiffs dispute this fact and cite to Defendant Becker's declaration.  (Dkt. No. 38, Attach. 34, at ¶¶ 18-19.)  Defendant Becker testified that, when Plaintiff James stopped attending SERT trainings altogether, Defendant Becker delegated "what otherwise would have been James's duties–including leading the bi-weekly SERT trainings–to another Correction Officer, Officer Maggio."  (*Id.* at ¶ 18.)  Defendant Becker's testimony does not refute the fact that, as an assistant commander, Plaintiff James was initially responsible for helping lead bi-weekly trainings for SERT members.

27.     Plaintiff James claims that Defendant Becker would give his friends preferred assignments, although they were less senior than Plaintiff James.

28.     Plaintiff James also claims that, despite being his second in command, Defendant Becker would fail to include him in discussions of SERT activities and trainings.  Instead, Plaintiff James claims that Defendant Becker would have these discussions with less senior, white officers–members of what Plaintiff James termed Defendant Becker's "good old boys club," "good old white boys club" or "little white boys inner circle."

29.     Plaintiff James agreed that Officer Anthony Maggio was more "in the loop" than he was.[6]

30.     Plaintiff James conceded that he did not know that these conversations between Defendant Becker and the junior officers regarded SERT.[7]

31.     Defendant Becker had, in fact, made Officer Maggio one of the team's assistant commanders.

32.     Defendant Becker invited Plaintiff James, who would regularly transport inmates and thus be out of building for periods of time, to come to his office and check in with him periodically to discuss team activities.[8]

---

[6]     Plaintiffs' attempt to dispute this fact is undermined by a fair reading of pages 79 and 80 of Plaintiff James' deposition transcript.  (Dkt. No. 38, Attach. 15, at 79-80.)

[7]     Plaintiffs dispute Defendants' asserted fact but cite to a portion of the record in which Plaintiff James testified that, while certain white officers (less senior than him, and without the title of Assistant Commander of SERT) were routinely called to Defendant Becker's office and had knowledge of SERT activities, Plaintiff James did not know the content of the conversations in Defendant Becker's office.  As a result, Plaintiffs have not disputed the above-stated fact.

[8]     Plaintiffs dispute this fact, citing to the same portion of the record evidence as do Defendants.  Plaintiffs' response attempts to controvert an *implication* of the asserted fact or to place it in context, which is improper and, thus will be deemed an admission.  N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's responses shall . . . admit[] and/or deny[] each of the movant's *assertions* in matching numbered paragraphs."); *see also Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts); *cf. Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the

33.     Despite the invitation, Plaintiff James never went to Defendant Becker's office to discuss SERT.

34.     Plaintiff James claims that, at some point during his tenure as assistant SERT commander, the team ordered new jackets, and that these jackets were delivered to white officers before black officers.

35.     Defendant Becker delegated the task of distributing the jackets to a subordinate, Officer Maggio.

36.     Plaintiff James does not know how Officer Maggio determined the order in which to distribute the jackets, but claims that Officer Maggio gave them to his circle of friends–his "little white boys club"–first.

37.     Plaintiff James discussed this with Defendant Becker, who advised that he merely told Officer Maggio to hand out the jackets.

38.     These jackets arrived in multiple shipments and, eventually, all members of SERT received a new jacket.

39.     Plaintiff James was provided one of the jackets from the first shipment; but it did not fit him so he gave it to another officer.[9]

---

court's local rules where "Plaintiff's purported denials . . . improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make"). To the extent that a non-movant desires to set forth any additional material facts that he contends are in dispute, he or she is required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs

[9]     Plaintiffs' attempt to dispute an *implication* of the above-asserted fact, or to place it in context, is improper. *See, supra* note 8 of this Decision and Order.

40.     During the course of his tenure as assistant commander of SERT, Plaintiff James would periodically refuse to attend SERT trainings out of protest of what he perceived to be mistreatment by Defendant Becker.

41.     In March of 2014, Plaintiff James stopped attending SERT trainings altogether–trainings which he, as assistant commander, was responsible for leading.[10]

42.     Plaintiff James did not attend any of the bi-weekly SERT trainings from March of 2014 through March 3, 2015.

43.     After he stopped attending trainings in March 2014, Plaintiff James never spoke to either Defendant Becker or any other supervisor about his reasons for doing so.[11]

44.     On or about March 3, 2015, Plaintiff James received a letter from Defendant Becker advising that he was removing Plaintiff James from SERT because he had not reported to trainings since March 2014.

45.     After receiving the letter advising him of his removal from SERT, Plaintiff James complained verbally to Colonel Hanstein that Defendant Becker's actions were unfair.  Colonel Hanstein gave Plaintiff James permission to bring his complaint to Defendant Van Blarcum.

46.     Plaintiff James advised the Defendant Van Blarcum that he could no longer work with Defendant Becker, the SERT commander.[12]

---

[10]     Plaintiffs provide the same or substantially the same response that was discussed above in note 5 of this Decision and Order.

[11]     Plaintiffs dispute this fact and cite to Plaintiff James' testimony in which he listed supervisors that he spoke to prior to when he stopped attending trainings in March 2014.  (Dkt. No. 38, Attach. 15, at 85-86.)  Therefore, Plaintiffs' citation does not refute the fact asserted.  Moreover, as set forth above in note 8 of this Decision and Order, Plaintiffs attempt to place Plaintiff James' comments in context is inappropriate.

[12]     Plaintiffs dispute this fact and cite to the same page of deposition testimony from Plaintiff James as Defendants cite to.  (Dkt. No. 38, Attach. 15, at 99.)  In his deposition, Plaintiff James testified that he told Defendant Van Blarcum as follows:

        A:      . . . I *just couldn't* work with him [Defendant Becker] anymore.
        Q:      You refused to do the S.E.R.T. training?

47.     Defendant Van Blarcum may have asked Plaintiff James if he would reconsider, and certainly asked him, if he had the opportunity to do so, would he rejoin the team.[13]

48.     Plaintiff James responded that he would "have to think about it.  Becker is the problem."

49.     Plaintiff James did not advise anybody that he believed Defendant Becker's actions were racially motivated.

50.     Shortly after his removal from SERT, in May of 2015, the Sheriff's Office created a dedicated "transport team," a group of officers who do nothing but court transports.

51.     The transport team had been under discussion for about six months prior.

52.     Historically, to get onto the transport team, and officer had to pass a physical agility test, unless the officer was exempt from the physical agility test as a supervisor or SERT member.[14]

53.     The decision to include an agility test as a prerequisite to membership on the transport team came about as a result of an incident captured on video in which a senior officer dropped something on the ground during a transport detail and was unable to stand up after retrieving it.

---

A:      Refused to work with Major Becker on the S.E.R.T. team because of his unfair treatment.
Q:      So you refused to work with the S.E.R.T. commander?
A:      I didn't want to work with him anymore, yes.

(*Id.* [emphasis added])  Therefore, the Court finds that Plaintiff James testified he could no longer work with Defendant Becker as asserted by Defendants.

[13]     Plaintiffs dispute this fact.  However, Plaintiff James as follows: "If I remember correctly, I'm not sure, but he may have asked me would I reconsider.  I was very valuable to them and would I reconsider going back on the team and I said it's not about the team, it's about Major Becker . . . . He asked me would I, if I had the opportunity [to rejoin the team] would I go back."  (Dkt. No. 38, Attach. 15, at 100.)

[14]     (Dkt. No. 38, Attach. 15, at 109-11, 115-16.)

54.     This agility test, as well as the specific requirements of that test, were outlined in a memorandum posted more than a month before the test was to take place.

55.     The agility test included a half-mile distance run.

56.     Plaintiff James did not believe he would pass the long-distance run portion of the transport team agility test, because he had never before passed a long-distance run test in his career at the Sheriff's Office.

57.     Though Plaintiff James had more than one month's notice of the agility test–including notice of the distance he would have to run and the time he would have to run it in–he did nothing to train.

58.     Plaintiff James believed he would be exempted from the agility test, because he had been exempted from other tests in the past.

59.     Plaintiff James concedes, however, that the memorandum listed supervisors and SERT members as the only classes of employees who were exempted from the agility test and that he was not among them.

60.     Plaintiff James took the agility test and failed the long-distance run.

61.     Plaintiff James was not assigned to the transport team and was informed that it was because he failed the physical agility test.

62.     Though Plaintiff James believes the test was created to exclude him personally from the transport team, he concedes that race would not have affected one's chance of passing the long-distance run portion of the agility test.[15]

---

[15]     Plaintiffs dispute this asserted fact because Plaintiff James' testimony was in response to an "argumentative question by Defendants['] Counsel." (Dkt. No. 44, at ¶ 74.) However, Plaintiffs' counsel did not object to the question and thus did not preserve this argument. (Dkt. No. 38, Attach. 15, at 119.) Instead, Plaintiffs' counsel objected to the prior question, Defendants' counsel rephrased the question, and Plaintiffs' counsel did not object again. (*Id.*) Moreover, Plaintiff James' testimony supports the above-asserted fact.

63.     After failing the agility test, Plaintiff James complained by e-mail to Defendant Van Blarcum.

64.     In the e-mail, Plaintiff James stated that, based on his experience, the agility test should not have been a prerequisite for assignment to the transport team.

65.     Defendant Van Blarcum responded that he felt the test was the fairest way to select officers for the team.

66.     Plaintiff James did not follow up after that.

67.     Plaintiff James has never heard Defendant Becker use a racial epithet or other racially derogatory language.

68.     Plaintiff James has never heard of Defendant Van Blarcum making a racist comment of any kind.

69.     In fact, the only Sheriff's Office employee who Plaintiff James has ever personally heard use a racial epithet in the jail is Cliff Bell, a fellow Correction Officer.

70.     Plaintiff James cannot recall any supervisor ever being present on any occasion which Officer Bell used a racial epithet.

71.     Plaintiff James never formally reported Officer Bell's use of that language to anyone.

TYRONE BRODHEAD

72.     Plaintiff Tyrone Brodhead has worked for the corrections division of the Ulster County Sheriff's Office since 1990, beginning as a part-time Correction Officer and moving to full-time in 1999.  He has been employed as a Correction Officer since his hiring.

73.     Plaintiff Brodhead is a member of SERT and has been for the past sixteen years.

74.     Plaintiff Brodhead is also a member of the Ulster County Emergency Response Team ("UCERT"), and has been for the past ten years.

75.     Plaintiff Brodhead considers a position on UCERT to be a prestigious and sought-after one.

76.     Though Plaintiff Brodhead sought promotion early in his career with the Sheriff's Office, he never passed a promotional examination.

77.     During the course of his employment, Plaintiff Brodhead has never sought to move to a different job assignment within the jail.[16]

78.     He claims, however, that he has been passed over advancements in rank within SERT on the basis of his race.

79.     Plaintiff Broadhead believes that there are two positions under the SERT Commander: assistant commander and third-in-command.

80.     Neither title comes with an increase in pay or benefits, only prestige.

81.     Defendant Becker, the SERT commander, testified that there is no third-in-command position, though the team did have two assistant commanders for a time.

82.     As discussed above, Plaintiff James served as the assistant commander of SERT from 2005 until he was removed in 2015 after failing to show up for practice for a year.[17]

---

[16]     Plaintiffs dispute this asserted fact and attempt to place it in context by referring to an indirect denial of a position outside of the jail and an advancement of rank within the jail.  As set forth above in note 8 of this Decision and Order, Plaintiffs' attempt to place the asserted fact in context is improper.  Plaintiff Brodhead testified as follows:

> Q:     Okay.  Now, outside of the civil service, had you sought to be moved to different job assignments within the jail at any point during the course of your employment with the sheriff's office?
>
> A:     No.  Not job assignments, no.

(Dkt. No. 38, Attach. 16, at 24-25.)

[17]     Plaintiffs dispute this fact and cite to their responses where they disputed Plaintiff James' responsibilities within SERT when he stopped attending trainings in March 2014.  As set forth above in note 5 of this Decision and

83. Plaintiff Brodhead also claims he was denied the opportunity to become a firearm or defensive tactics instructor on the basis of his race.

84. To become an instructor, one must first attend Instructor Development School.

85. Plaintiff Brodhead wrote a letter expressing his interest in becoming an instructor in or about 2015.

86. Within a couple of weeks of sending his letter of interest, Plaintiff Brodhead withdrew his application.

87. Plaintiff Brodhead withdrew his application because he felt he would not get the position based on a comment by Defendant Becker that he needed to "get with the program" if he wanted to be an instructor.[18]

88. After Plaintiff Brodhead withdrew his application, the Sheriff's Office sent nobody to the Instructor Development School.

89. Plaintiff James is both a firearm and defensive tactics instructor–as well as an instructor in, among other things, first aid, chemical agents, reality based training and active shooters.

90. During the course of his employment with Ulster County, Plaintiff Brodhead has been counseled in writing for the following: (1) bringing contraband–a cassette tape–in to the jail in 1999; (2) a report-writing issue in 1999 or 2000; and (3) cell phone use while on duty in December 2012.

---

Order, Defendant Becker's testimony does not refute the fact that as assistant commander, Plaintiff James was responsible for helping lead bi-weekly trainings for SERT members. Moreover, Plaintiffs' citations to the record do not dispute that Plaintiff James held the title of assistant commander of SERT until he was removed from the team in March 2015.

[18] Plaintiffs dispute this fact and attempt to place it in context with other testimony provided by Plaintiff Brodhead. (Dkt. No. 44, at ¶ 99.) As set forth above in note 8 of this Decision and Order, Plaintiffs response is improper and is deemed an admission.

91.     During the course of his employment with Ulster County, Plaintiff Brodhead has been suspended once, in 2010, for a period of 30 days after voluntarily settling charges stemming from an incident in which he was charged with endangering the welfare of a child after providing alcohol to his step-daughter.[19]

92.     Plaintiff Brodhead voluntarily settled these charges and agreed to the 30-day suspension, on the advice of his union representative.

93.     Aside from the above, the only other discipline of any kind Plaintiff Brodhead received during the course of his employment with Ulster County was a verbal reprimand for wearing a "5-11 tactical jacket" while on duty.[20]

94.     This jacket was issued for an undercover detail and bears no markings or insignia identifying the wearer as an employee of the Sheriff's Office.

95.     Correction Officers are not permitted to wear this jacket while on duty.

96.     This verbal reprimand had no impact on the terms of Plaintiff Brodhead's employment.[21]

---

[19]     Plaintiffs dispute this fact and attempt to place it in context with other testimony provided by Plaintiff Brodhead that it was a "sip" of alcohol provided to his step-daughter. (Dkt. No. 44, at ¶ 103.) As set forth above in note 8 of this Decision and Order, Plaintiffs response is improper and is deemed an admission.

[20]     In their Rule 7.1 Response, Plaintiffs combined their response to this asserted fact with that stated above in Part I.B. ¶ 92 of this Decision and Order. (Dkt. No. 44, at ¶ 104.) Plaintiffs responded that both facts were admitted. (*Id.*) The Court deems this admission as applicable to Defendants' asserted facts in ¶ 92 and ¶ 93. (*Compare* Dkt. No. 38, Attach. 1, at ¶¶ 104-105 *with* Dkt. No. 44, at ¶ 104.)

[21]     Plaintiffs dispute this fact. Plaintiff Brodhead's exact testimony was as follows:

> Q:     Did the verbal counseling have, to your knowledge, any impact on the terms of your employment or your compensation or your job assignment or anything like that?
> A:     No.

(Dkt. No. 38, Attach. 16, at 48.) Plaintiffs also do not cite to any portion of the record in support of their denial. *See N.Y. Teamsters v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1[a][3] strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1[a][3] statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations"); *Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 319 (S.D.N.Y. 2003) (holding that "the facts set forth in [plaintiff's] statement are

97.     Plaintiff Brodhead claims that he has been subjected to three canine searches of his locker.

98.     Plaintiff Brodhead was not present for any of these searches and does not know how canine searches are performed.

99.     He does not know whether other officers' lockers were searched at the same time as his was.

100.    Plaintiff Brodhead believes these searches were conducted out of retaliation for a complaint he had made against the canine officer, Officer Maggio, for allowing his dog to run free and unleashed during SERT trainings (although Plaintiff Brodhead believes that race "has something to do with it as well").

101.    Plaintiff Brodhead also asserts there has been tension between himself and Officer Maggio ever since Officer Maggio was named second in command of SERT.

102.    Plaintiff Brodhead testified that he voiced his opinion to the entire SERT team that Officer Maggio was not qualified for the position, including in front of Officer Maggio himself.

103.    Plaintiff Brodhead has never known Officer Maggio to make racially discriminatory comments nor has he ever acted in a way Plaintiff Brodhead perceived as discriminatory, with the exception of the canine searches.

104.    After Plaintiff Brodhead filed his Notice of Claim against the County, in which he alleged that the sole reason for the canine investigations was racism, he wrote a letter to the

---

deemed established" where defendant denied assertions in plaintiff's S.D.N.Y. Local Rule 56.1 statement but declined to provide record citations in support).

Sheriff's Office stating he believed the investigations were a result of his complaint about Officer Maggio's canine.

105.    Plaintiff Brodhead believes that race played a role in Officer Maggio's canine investigations because these searches "only happen[ ] to the black officers."

106.    Plaintiff Brodhead conceded that he does not know of any other black officers, aside from himself, who claim to have been subjected to locker searches.

107.    Plaintiff Brodhead claims that other Correction Officers, including Officer Maggio, have attempted to convince inmates to falsely accuse Plaintiff Brodhead of bringing drugs into the jail.

108.    Plaintiff Brodhead concedes that the only people who ever told him about these alleged schemes were the inmates themselves.

109.    In his EEOC Complaint, Plaintiff Brodhead asserted that there were instances in which coworkers "let the n-word slip."

110.    At his deposition, he testified that his EEOC Complaint's allegation about use of the "n-word" by co-workers might be a mistake, because he has never personally heard anyone use that word at the jail.

111.    Plaintiff Brodhead claims that he has heard through the grapevine of other Correction Officers using racial epithets, but cannot remember who he heard such allegations from.

112.    Plaintiff Brodhead claims that he has been subjected to several internal investigations relating to contraband, but no such investigation has ever resulted in any form of discipline.

113.    Plaintiff Alphonso Lacey has worked for the corrections division of the Ulster County Sheriff's Office for 20 years.

114.    He has been employed at the rank of Correction Officer since his hiring.

115.    Since his hiring, Plaintiff Lacey has taken several promotional examinations.

116.    Plaintiff Lacey failed the first exam he took.

117.    On the second exam he took–in or around 2002 or 2003– Plaintiff Lacey scored a 90, placing him 5th on the list of individuals eligible for a promotion.

118.    Following that test, four individuals were promoted.

119.    Each of those individuals promoted scored the same or higher than Plaintiff Lacey on the promotional examination.

120.    Another black officer was among those promoted.

121.    After the first group of officers was promoted, Plaintiff Lacey was disciplined for stealing gas from the County.

122.    Plaintiff Lacey admitted his error and voluntarily accepted a suspension on the advice of his union representative.[22]

123.    Plaintiff Lacey does not believe that he was disciplined in connection with this incident because of his race, nor does he believe he was punished more severely because of his race.

124.    At some point thereafter, another group of officers was promoted from that promotional list, each with a score below that of Plaintiff Lacey's.

125.    Plaintiff Lacey was not promoted before that list expired.

---

[22]    (Dkt. No. 28, Attach. 17, at 36-38.)

126. Plaintiff Lacey claims he took every promotional examination offered thereafter.

127. On each of these subsequent exams, Plaintiff Lacey scored lower than those promoted based on their corresponding exam score.[23]

128. Plaintiff Lacey acknowledges this, but nevertheless claims that he should have been promoted on the basis of his seniority.

129. Aside from his suspension for stealing gas, Plaintiff Lacey was also disciplined for a domestic incident in 2007.

130. On April 27, 2007, the Sheriff's Office issued disciplinary charges against Plaintiff Lacey alleging, among other things, that he physically prevented his wife from leaving the house and struck her on the side of the neck.

131. Plaintiff Lacey denies the facts of the underlying incident and denies having ever seen these disciplinary charges.

132. Nevertheless, he signed a stipulation of settlement related to those charges, admitting "the charges and specifications are correct and I hereby admit my error."

133. Plaintiff Lacey asserts that Defendant Becker pursued disciplinary charges in relation to this incident due to Plaintiff Lacey's race.

134. Plaintiff Lacey believes the charges were racially motivated "[b]ecause [he] believe[s] Becker is a racist."

135. Plaintiff Lacey's belief that Defendant Becker is a racist arises from observations he made while on SERT team under Defendant Becker's command.

---

[23] Plaintiffs dispute this fact and point to Plaintiff Lacey's testimony that on the first exam he took (the exam on which he scored a 90), a white Correction Officer, Officer Jen DeCicco was promoted after scoring a 75. (Dkt. No. 44, at ¶ 139.) The citation provided by Plaintiffs does not dispute the fact asserted by Defendants.

136.    Plaintiff Lacey asserts that Defendant Becker tried to physically hurt him and get him to quit the team.

137.    During Plaintiff Lacey's tenure with SERT, there were, give or take, eight other black officers on the team.

138.    Plaintiff Lacey could not say whether Defendant Becker ever tried to get any of the other black officers to quit.

139.    Nor could Plaintiff Lacey state whether Defendant Becker attempted to hurt other black officers.  He testified that "I was the only one that I know that was going through that with Becker."

140.    During each incident in which Plaintiff Lacey claims Defendant Becker attempted to hurt him, Plaintiff Lacey made no complaints nor did he give any outward sign of distress.

141.    Plaintiff James was the assistant SERT commander during this time frame, and Plaintiff Lacey recalls Plaintiff James joking with other officers about Plaintiff Lacey knowing the martial art, Aikido.

142.    Plaintiff James testified that, when Plaintiff Lacey was on SERT with Plaintiff James, he does not recall getting the impression that Defendant Becker was picking on Plaintiff Lacey, nor, even with the benefit of hindsight, does he know if he gets that impression now.[24]

143.    Plaintiff Ross was also on SERT with Plaintiff Lacey under Defendant Becker's command.  Plaintiff Ross could not recall any incidents where he noticed Defendant Becker mistreating Plaintiff Lacey.

144.    Plaintiff Lacey was suspended from SERT after confronting another SERT member who was romantically involved with his wife.

---

[24]      (Dkt. No. 38, Attach. 15, at 156-57.)

145. Plaintiff Lacey was eventually removed from the team altogether in or around 2005 or 2006–approximately 10 years before he filed his Summons in this action–after being charged with stealing gas.

146. Plaintiff Lacey could not say why he believed Defendant Becker's actions were racially motivated, except that he believed he had given Defendant Becker no other reason to dislike him.[25]

147. Plaintiff Lacey has never heard Defendant Becker use racially discriminatory language.

148. After Plaintiff Lacey left SERT in 2005 or 2006, he has not had to "deal with [Becker]."

149. Plaintiff Lacey has not heard Defendant Van Blarcum say anything that leads him to believe Defendant Van Blarcum treats black officers differently than white officers.

150. In addition to his claim that he was passed over for a promotion, Plaintiff Lacey also asserts that he was denied a position in booking.

151. Plaintiff Lacey claims that he was denied this position on the basis of his race.

152. He believes the decision was race-based because there were no black officers in booking–aside from Plaintiff Brodhead and a non-party officer named Johnson.

153. The booking assignment comes with no increase in pay.

154. Plaintiff Lacey testified that he has heard another Correction Officer use racist language on two occasions.

---

[25] Plaintiffs dispute this fact. However, in response to a question asking how Plaintiff Lacey knew that Defendant Becker's actions were racially motivated as opposed to motivated by a dislike of Plaintiff Lacey personally, Plaintiff Lacey testified, "I never did anything to Becker" (Dkt. No. 38, Attach. 17, at 110), "[t]here's no reason for him not to like me. I never did anything to him or said anything to him." (*Id.* at 112.) As a result, Plaintiff Lacey has not successfully controverted this fact.

155.  First, he heard Officer Bell use the word "jigaboo" in reference to another officer.

156.  Plaintiff Lacey could not say exactly when this took place, but believes it was some time after 2007.

157.  He did not discuss this incident with any of his superiors until about a year after the fact, and even then he merely used the incident as an example to support his claim in the discussion that there was racism in the jail.

158.  He recalled a second incident in or around 2008, in which an officer stated he would not vote for then presidential candidate Obama because of his race.

159.  Plaintiff Lacey never reported that incident to a supervisor.

160.  In fact, he testified that, at some point around "2005ish," he had stopped making any complaints whatsoever to supervisors.

## PAMELA LANCASTER

161.  Plaintiff Pamela Lancaster has worked for the corrections division of the Ulster County Sheriff's Office for more than ten years, since April 2007.

162.  Plaintiff Lancaster has been employed at the rank of Correction Officer since her hiring.

163.  Since her hiring, Plaintiff Lancaster has taken one promotional examination, in 2014.

164.  As a result of her score on that test, Plaintiff Lancaster testified that she placed at number 24 on the list for promotion to corporal and number 25 on the list for promotion to sergeant.

165.  Several officers were promoted as a result of that examination, and Plaintiff Lancaster does not believe she should have been promoted over them.

166.    Plaintiff Lancaster currently works the B-line shift, from 8:00 A.M. to 4:00 P.M.

167.    She has worked that shift for approximately three years.

168.    Prior to working B-line, Plaintiff Lancaster worked the 4:00 P.M. to midnight C-line shift for five years, and, before that, the midnight to 8:00 A.M. A-line shift for two years.

169.    Plaintiff Lancaster considers assignment to the "pods"–or the inmate housing units–to be less desirable than assignment to other posts in the jail.

170.    Plaintiff Lancaster believes white officers, and, indeed, Latino officers, receive better assignments than do black officers.

171.    Plaintiff Lancaster bases this belief on the fact that these officers are of a different race than she is and appear to be working better assignments than she does.

172.    In particular, Plaintiff Lancaster claims that she has long-sought an assignment working intake.

173.    At some point while Plaintiff Lancaster was working the C-line shift, her then-supervisors Sergeants Gunning and Stoutenburg asked if she would like to work intake.

174.    At no point prior did Plaintiff Lancaster request to be assigned to intake.

175.    Plaintiff Lancaster was trained on the intake position for two days, but never assigned there permanently.

176.    Plaintiff Lancaster followed-up with Sergeant Gunning to ask why she was not assigned to intake, but asserts that she never received a satisfactory answer.  She made no further inquiries as she did not believe they would have "gotten [her] anywhere."

177.    Since that time, Plaintiff Lancaster has never asked to be assigned to intake.

178.    Since moving to the B-line shift three years ago, Plaintiff Lancaster has never asked to be assigned to intake.

179.    Plaintiff Lancaster has never been disciplined in the course of her employment with Ulster County.  Indeed, she has never even received a written counseling.

180.    At some point in October 2015, while speaking with Plaintiff Lancaster, Sergeant Polacco referred to an inmate as "the colored girl with the blonde hair."

181.    Despite being trained in the County's harassment and discrimination policy every year, Plaintiff Lancaster did not, that day, report this incident.

182.    The following day, Plaintiff Lancaster discussed Sergeant Polacco's comments with her fellow Correction Officer, Officer Ellen Monroe.

183.    Officer Monroe apparently reported the incident to a supervisor, Lieutenant McGirr.

184.    Lieutenant McGirr subsequently called Plaintiff Lancaster to ask what had happened.  After Plaintiff Lancaster relayed the comment, Lieutenant McGirr advised that he would speak with Sergeant Polacco.

185.    At some point thereafter, Lieutenant McGirr called Plaintiff Lancaster to his office to discuss the incident and to ask what Plaintiff Lancaster would like to see done about it.

186.    Plaintiff Lancaster responded that it was not her place to say, that it was Lieutenant McGirr's job to decide.

187.    A couple of days later, Lieutenant McGirr again called Plaintiff Lancaster to his office.  This time, Sergeant Polacco was present as well.

188.    Sergeant Polacco apologized to Plaintiff Lancaster, stating: "Sorry, I will never say that again because it offended you."

189.    Prior to this incident, Sergeant Polacco had never said anything to Plaintiff Lancaster that offended her, nor has he said anything offensive to her since.

190. Following Sergeant Polacco's apology, Lieutenant McGirr asked that Plaintiff Lancaster forgive him.

191. Shortly thereafter, Plaintiff Lancaster brought her complaint to the County personnel office, an avenue she knew to be available to her as a result of her yearly harassment and discrimination trainings.

192. She ultimately met with the County Personnel Officer, Sheree Cross, twice.

193. After speaking with Plaintiff Lancaster, Ms. Cross advised that she would investigate.

194. In her deposition, Plaintiff Lancaster could not remember complaining to Ms. Cross about any other grievance she had aside from the issue of Polacco's comment.[26]

195. Plaintiff Lancaster recalls speaking with attorney Mary Roach during the course of an investigation into the incident.

196. Attorney Roach found Plaintiff Lancaster's complaint to be founded, but that there was not a hostile work environment in the jail.

197. Plaintiff Lancaster testified that, on one occasion, another Correction Officer had told her that Officer Wenzel had stated that a police dog's name was "Mandingo Hunter."

198. Plaintiff Lancaster reported this fact to her superiors, who then advised that they had spoken to Officer Wenzel about the incident.

199. In her deposition, Plaintiff Lancaster could not remember whether she spoke to the personnel office about this incident.[27]

---

[26]     However, there is evidence in the record that Plaintiff Lancaster did speak with Ms. Cross about other concerns she had regarding possible racism within the jail, and probably spoke to Ms. Cross that she was not receiving assignments because she was black.  (Dkt. No. 45, Attachs. 6, 7, 8; Dkt. No. 38, Attach. 8, at 79.)

[27]     However, as set forth above in note 26 of this Decision and Order, there is evidence in the record that Plaintiff Lancaster did speak with the personnel office about this incident.  (Dkt. No. 45, Attach. 8.)

200.    Plaintiff Lancaster spoke with Officer Wenzel the day after the incident and he told her that he would not have made the comment in front of a black officer.

201.    Plaintiff Lancaster also recalled being present for an incident in which Officer Wenzel joked with an inmate that "when you see a black man jogging, you know he stole something."

202.    Plaintiff Lancaster told Officer Wenzel that she was offended by what he had said, and she reported the incident to her supervisor.

203.    Plaintiff Lancaster did not know whether any supervisor ever spoke to Officer Wenzel about the incident, nor did she ever follow up to see if they had.

204.    She could not recall whether she spoke to personnel about it.[28]

205.    Plaintiff Lancaster testified that Officer Wenzel, on a couple of occasions, made what she believed to be a "heil Hitler" gesture toward her.

206.    Officer Wenzel denied that this was the intention of his gesture, but, regardless, stopped doing it once Plaintiff Lancaster asked him to.

207.    Plaintiff Lancaster never reported this behavior to anybody.

208.    All of these incidents with Officer Wenzel happened within a couple of months of each other.

209.    Plaintiff Lancaster believed that they occurred in 2014, but ultimately could not say for sure and, indeed, could not even recall what shift she was working at the time.

---

[28]    Plaintiffs dispute this fact and state that Plaintiff Lancaster testified she did remember telling personnel about this incident.  However, Plaintiff Lancaster's testimony was as follows:

        Q:    Did you tell personnel about what had taken place?
        A:    I don't remember.

(Dkt. No. 38, Attach. 18, at 99.)

210. Officer Wenzel has not said anything that Plaintiff Lancaster has found to be offensive since then.

211. Plaintiff Lancaster further recalled that in 2007 or 2008, while commenting on her hair, one of the sergeants referred to her as "Buckwheat."

212. She claims that she reported this matter to her supervisor, who reported it to Defendant Becker, who then called her at home to apologize on behalf of the sergeant.

213. The sergeant in question then apologized, and Plaintiff Lancaster considered the matter finished.

214. Between the time of that incident–in 2007 or 2008–and the incidents involving Officer Wenzel–which she believed occurred at some point in 2014– Plaintiff Lancaster could not recall hearing any other comment about her race.

215. Plaintiff Lancaster alleged that, for about a year, two of her fellow officers made "farting noises," both over the intercom and directly into Plaintiff Lancaster's ear.

216. When asked if she believed the noises were racially motivated, Plaintiff Lancaster testified that she did not know why the officers made the noises.

217. Plaintiff Lancaster complained about this behavior, but did not report being offended on the basis of her race.

218. Although Plaintiffs' Amended Complaint alleges that "it is commonplace and acceptable at the Sheriff's Office to refer to black people pejoratively as 'brothers' or 'sisters,' as 'colored' and even as 'jigaboos' and 'niggers,'" Plaintiff Lancaster denied hearing any such language at the jail (except for the use of the word "colored" by Sergeant Polacco).

219.    Plaintiff Timothy Ross worked for the Ulster County Sheriff's Office from 1998 to around 2012 or 2013.

220.    Throughout that time, Plaintiff Ross maintained the rank of Correction Officer.

221.    Plaintiff Ross testified that he never took a promotional examination and never sought a higher rank.  County records indicate that he took one exam in 2006 and failed.

222.    Aside from working the tiers, the only specific job assignment Plaintiff Ross sought was a position on SERT.

223.    Plaintiff Ross tried out and was assigned to the team, but eventually had to take leaves due to injuries he sustained.

224.    Plaintiff Ross cannot recall if, ultimately (after he was released to return to SERT) he voluntarily left SERT or whether he was removed from the team.[29]

225.    Plaintiff Ross eventually left the Sheriff's Office, but he testified that he could not recall exactly why, only that "[t]here were some issues that were going on"–specifically, "Workers' Comp fraud."

226.    According to Plaintiff Ross's understanding, the Sheriff's Office accused him of "[n]ot being at home" while he was out on workers' compensation leave.

227.    The Sheriff's Office brought both criminal charges and disciplinary charges under Section 75 of the Civil Service Law against Plaintiff Ross.

---

[29]    (Dkt. No. 38, Attach. 19, at 18-20.)

228. At the time of his deposition, Plaintiff Ross could not recall if the allegation against him, was accurate.[30]

229. He could not recall telling an investigator that he had violated the conditions of Article 10, Section 207-c of the General Municipal Law at least 60 times over a four-year period.

230. He recalled being charged with fraud, but could not recall being charged with grand larceny.

231. Plaintiff Ross pled guilty to criminal charges stemming from Workers' Compensation fraud.

232. Though he contends he had no choice in doing so, he was represented by an attorney who recommended he plead guilty.

233. In connection with the Section 75 disciplinary charges, Plaintiff Ross was represented by his union.

234. On the advice of his union representative, Plaintiff Ross voluntarily resigned his position with the Sheriff's Office before any determination could be reached on his disciplinary charges.

235. Plaintiff Ross asserts that his union recommended he resign, advising him that it did not believe he could beat the charges against him.

236. Plaintiff Ross acknowledged signing the resignation letter and submitting it to the Sheriff's Office.

---

[30]    Plaintiffs dispute this fact by attempting to place it in context.  As set forth above in note 8 of this Decision and Order, Plaintiffs' response is improper and will be deemed an admission.

237.    Plaintiff Ross claims he was coerced into resigning by his own union representative and cannot recall whether anyone at the Sheriff's Office coerced him to resign.[31]

238.    Aside from his union representative, Plaintiff Ross could not recall speaking with any of his supervisors about whether he should resign.

239.    Plaintiff Ross never spoke to Defendant Becker about the issue.

240.    Aside from the suspension Plaintiff Ross received while these disciplinary charges were pending, he was never suspended, nor had he ever received a written counseling while employed by the Sheriff's Office.

241.    Plaintiff Ross recalled that he had heard racially discriminatory language in the jail from time to time.

242.    He recalled an incident in which Officer Polacco used the "n-word" in or about 1999–an incident for which Officer Polacco was disciplined.

243.    He recalled that a fellow officer, Officer Brooks, jokingly said the "n-word" in his presence, and made other racially-charged comments about black officers.

244.    Plaintiff Ross had no recollection of when Officer Brooks made these comments.

245.    Plaintiff Ross mentioned the issue to his lieutenant and/or Corporal Wranovics, and Officer Brooks stopped making these comments.[32]

246.    Plaintiff Ross had no knowledge of whether anybody ever reprimanded Officer Brooks for his comments.

247.    Plaintiff Ross recalled that fellow Correction Officer John Legg referred to him as a "Blaxican," referencing Plaintiff Ross's black and Latino background.

---

[31]    (Dkt. No. 38, Attach. 19, at 44-46.)

[32]    (Dkt. No. 38, Attach. 19, at 74-75.)

248. Plaintiff Ross could not recall when Officer Legg said this.

249. Plaintiff Ross complained to supervisors about this, but does not know whether anybody ever reprimanded or spoke to Officer Legg.

250. Plaintiff Ross claims that any time an officer made a complaint about a higher-up, there were "repercussions."

251. According to Plaintiff Ross, these repercussions came in the form of having his work schedule changed, though he acknowledged that his schedule changed even when he had not raised a complaint.

252. Plaintiff Ross did not know who would change his schedule, but assumed it was a chart officer.

253. He assumed the chart officer's motivation was to give his/her friends more favorable assignments.

254. Plaintiff Ross never complained about this, because he was concerned about repercussions.

255. Aside from Officers Polacco, Legg and Brooks, Plaintiff Ross could not recall anyone else using any racially discriminatory language in the jail.

### C. Parties' Briefing on Defendants' Motion for Summary Judgment

#### 1. Defendants' Memorandum of Law-in-Chief

Generally, in support of their motion for summary judgment, Defendants assert five arguments. (*See generally* Dkt. No. 38, Attach. 41 [Defs.' Mem. of Law].)

First, Defendants argue that all of Plaintiffs' claims are untimely. (*Id.*) Defendants argue that Plaintiffs' allegations in this case span nearly two decades beginning in roughly 1998 or 1999. (*Id.*) The statute of limitations for Plaintiffs' claims under 42 U.S.C. § 1983 and the New

York State Human Rights Law ("NYSHRL") is three years. (*Id.*) The statute of limitations for Plaintiffs' claims under 42 U.S.C. § 1981 is four years. (*Id.*) The statute of limitations for Plaintiffs' claims under Title VII requires that a Plaintiff file a charge with the EEOC within 300 days of the alleged unlawful employment practice. (*Id.*) As a result, Defendants argue that discrete acts of discrimination occurring prior to August 30, 2013, for claims under § 1983 and the NYSHRL and occurring prior to August 30, 2012, under § 1981, are time barred. (*Id.*) Moreover, Defendants argue that discrete acts of discrimination occurring before October 29, 2014 (300 days before Plaintiffs James, Brodhead and Lacey filed their EEOC Charges), for claims under Title VII are time barred. (*Id.*) Defendants argue that none of the incidents occurring outside of the statutory periods for each cause of action should be considered pursuant to the continuing-violation doctrine. (*Id.*) Further, Defendants argue that every one of Plaintiff Lacey's claims falls outside the applicable limitation periods. (*Id.*)

Second, Defendants argue that, Plaintiffs' disparate-treatment claims (Claims One, Four, Six, and Seven) should be dismissed because (a) with regard to Plaintiffs' failure-to-promote claims, Plaintiff Lacey is the only Plaintiff to have passed and scored well enough to be reachable for a promotion after a civil service exam in 2002, which expired in 2007, and for which the statute of limitations has expired, (b) with regard to Plaintiffs' claims of discriminatory assignments, no Plaintiff has suffered a materially adverse employment action and there is no evidence of a discriminatory motive behind any job assignments, (c) with regard to Plaintiffs' claims of discriminatory discipline, there is no evidence of an agency-wide scheme by which black officers are punished more severely than white officers for the same or lessor offenses and there is no evidence that Plaintiffs have been the subject of racially-discriminatory discipline, (d) Plaintiffs have not suffered any other adverse employment action, (e) with regard

to Plaintiffs' disparate-treatment claims pursuant to §§ 1981 and 1983 (Claims One and Four), no Plaintiff has suffered an adverse employment action and no Plaintiff can point to evidence of a causal link between the slight they claim to have experienced and their race, (f) with regard to Plaintiffs' disparate-treatment claim pursuant to Title VII (Claim Six), Plaintiff Lacey and James' claims that they were denied promotions are time-barred and Plaintiff Brodhead has never passed a promotional exam, and (g) with regard to Plaintiffs' disparate-treatment claim pursuant to NYSHRL (Claim Seven), this claim fails for the same reasons that Plaintiffs' other disparate treatment claims fail. (*Id.*)

Third, Defendants argue that Plaintiffs' hostile-work-environment claims pursuant to 42 U.S.C. §§ 1981 and 1983 (Claims Two and Five) should be dismissed because (a) Plaintiffs have not been subjected to a hostile work environment in that each Plaintiff identifies one or two isolated incidents occurring over the course of a decade or more, which is not the severe and pervasive conduct required to maintain a hostile-work-environment cause of action and there is no evidence of a race-based motive for any of the discriminatory conduct alleged by Plaintiffs, and (b) there is no basis for imputing any alleged misconduct to Defendants, who none of the Plaintiffs have ever heard utter a racial epithet. (*Id.*)

Fourth, Defendants argue that Plaintiffs' claims pursuant to 42 U.S.C. §§ 1981 and 1983 (Claims One, Two, Three, Four, and Five) should be dismissed against individual Defendants Van Blarcum, Becker, and Russo. (*Id.*) Defendants argue that Plaintiffs testified they have not heard any of the individual Defendants utter a racial epithet. (*Id.*) Moreover, Defendants argue that Plaintiffs have not suffered any adverse employment action by reason of their race and have not suffered any constitutional deprivation at the hands of the individual Defendants. (*Id.*) Furthermore, Defendants argue that Plaintiffs have not shown racial animus by Defendants. (*Id.*)

Fifth, Defendants argue that Plaintiffs' claims pursuant to 42 U.S.C. §§ 1981 and 1983

(Claims One, Two, Three, Four, and Five) should be dismissed against the County because

Plaintiffs do not describe a pattern of misconduct (sufficient to constitute a municipal custom,

policy, or practice) but describe isolated incidents perpetuated by a handful of co-workers which

were either never reported, or if reported, were fully investigated and addressed.  (*Id.*)

### 2. Plaintiffs' Opposition Memorandum of Law

Generally, in response to Defendants' motion for summary judgment, Plaintiffs assert

two arguments while "abandoning" claims that "seek damages for Plaintiffs' individual job

assignment[s]."  (*See generally* Dkt. No. 43 [Pls.' Opp'n Mem. of Law].)[33]

First, Plaintiffs argue that their claims are timely pursuant to the continuing-violations

exception under Title VII, which also applies to racial harassment claims pursuant to 42 U.S.C. §

1983.  (*Id.*)  Plaintiffs argue that, while Plaintiffs highlight evidence dating back to the late

1990s, the racial slurs and management structure (in which minority officers are noticeably

absent) continue to the present day.  (*Id.*)  Therefore, Plaintiffs argue that the jury may find that

this regime of racial harassment and discrimination created a hostile work environment such that

all related acts, including those that fall outside the statute of limitations, comprise a continuing

violation.  (*Id.*)

Second, Plaintiffs argue that they have asserted actionable claims for a racially hostile

work environment for five reasons: (1) Plaintiffs have been exposed to racial slurs in the

workplace; (2) Plaintiffs are subjected to race-neutral but race-based harassment in the form of

---

[33]     Plaintiffs' opposition memorandum of law does not address Defendants' arguments regarding Plaintiffs'
disparate-treatment claims.  (*See generally* Dkt. No. 43.)  Plaintiffs' memorandum explicitly states, "Plaintiffs
proceed on a hostile work environment claim, alleging that working conditions at the County Jail were infected with
racial discrimination in personnel decisions."  (Dkt. No. 43, at 26.)  This statement further lends to the conclusion
that Plaintiffs have abandoned their disparate-treatment claims.

being ignored for job assignments, unequal distribution of work-related clothing, physical assaults during training sessions, and false accusations of criminal behavior; (3) Plaintiffs have been consistently denied job promotions and, with few exceptions, the jail has for years been run by white supervisors; (4) everything about the 2015 "investigation" regarding Sergeant Polacco's reference to a "colored girl" when describing a black inmate is evidence of a race-based hostile work environment; and (5) Defendant County is liable for the hostile work environment because the jury may find municipal liability pursuant to Title VII and 42 U.S.C. §§ 1981 and 1983. (*Id.*)

### 3. Defendants' Reply Memorandum of Law

Generally, in their reply, Defendants assert three arguments. (Dkt. No. 47, Attach. 1 [Defs.' Reply Mem. of Law].)

First, Defendants argue the continuing-violation doctrine is inapplicable here, because (a) the doctrine is disfavored in the Second Circuit and should be applied only upon a showing of compelling circumstances, and (b) Plaintiffs are not alleging a hidden pattern of racist behavior but instead discrete instances, each one distinct from the other, which could have been grieved and acted on in a timely manner. (*Id.*) Defendants point out that these discrete acts were perpetuated by different actors, often under the administrators of different Sheriffs. (*Id.*)

Second, Defendants argue that Plaintiffs' hostile-work-environment claims should be dismissed because the allegedly racially-motivated grievances set forth by Plaintiffs were either not reported to supervisors, were the result of the individual Plaintiffs' own choices, were based on hearsay, occurred too long ago to be considered, were addressed by administration and not repeated, or were perpetuated by the union as opposed to by the Sheriff's Office. (*Id.*) In addition, Defendants argue that Plaintiffs are unable to show how the incidents alleged impacted the terms or conditions of their employment. (*Id.*) Moreover, Defendants argue that Plaintiffs

did not address Defendants' argument that Plaintiffs were not eligible or reachable for the promotions that they sought. (*Id.*) Defendants also argue that Plaintiffs seek to litigate the issue whether Sergeant Polacco is a racist. (*Id.*) However, Defendants argue that there is no evidence that Polacco's mere presence somehow affected the terms and conditions of any person's employment. (*Id.*)

Third, Defendants argue that Plaintiffs' Amended Complaint should be dismissed. (*Id.*) Defendants argue that it is unclear whether Plaintiffs opposed Defendants' arguments as to the disparate-treatment causes of action (Claims One, Four, Six, and Seven) because Plaintiffs did not address Defendants' arguments. (*Id.*) Defendants also argue that Plaintiffs' "inexorable zero" argument is inapplicable because Plaintiffs are not seeking to vindicate the rights of a class of individuals. (*Id.*) Moreover, Defendants argue that, with regard to the disparate-discipline claims, Plaintiffs rely solely on hearsay deposition testimony from Plaintiff James as opposed to any disciplinary records that Defendants turned over during discovery. (*Id.*) In any event, Defendants argue that Plaintiffs have not suffered any actionable discipline within the statutory time period nor have Plaintiffs compared the allegedly inadequate disciplines imposed on white offers to disciplines imposed on Plaintiffs that were unduly severe. (*Id.*)

## II. GOVERNING LEGAL STANDARD

### A. Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[34]  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.  Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group,*

---

[34]        As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

*Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[35]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[36] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

---

[35]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[36]     *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

Moreover, the "principles governing admissibility of evidence do not change on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," and a "district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009).

**B.      Standards Governing Plaintiffs' Claims and Defendants' Defenses**

Because the parties have (in their memoranda of law) demonstrated an accurate understanding of the legal standards governing Plaintiffs' claims and Defendants' defenses in this action, the Court will not recite those legal standards in their entirety in this Decision and Order, which is intended primarily for the review of the parties. (*See generally* Dkt. No. 38 Attach. 41 [Defs.' Mem. of Law]; Dkt. No. 43 [Pls.' Opp'n Mem. of Law]; Dkt. No. 47, Attach. 1 [Defs.' Reply Mem. of Law].) Instead, the Court will merely focus on certain portions of those standards where necessary below in Part III of this Decision and Order.

**III.    ANALYSIS**

**A.      Plaintiffs' Disparate-Treatment Claims (Counts One, Four, Six, and Seven)**

After carefully considering the matter, the Court grants Defendants' motion for summary judgment regarding Plaintiffs' disparate-treatment claims, for the reasons stated in Defendants' memoranda of law, including their arguments of untimeliness. (Dkt. No. 38, Attach. 41 [Defs.' Mem. of Law]; Dkt. No. 47, Attach. 1 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis, which is intended to supplement but not supplant Defendants' arguments.

In disparate-treatment cases, "the plaintiff is required to prove that the defendant had a discriminatory intent or motive." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988). "[A] prima facie case is ordinarily established by proof that the employer, after having rejected the plaintiff's application for a job or promotion, continued to seek applicants with qualifications similar to the plaintiffs." *Watson*, 487 U.S. at 986 (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, and n.6 (1981). "The burden of proving a prima facie case is 'not onerous,' and the employer in turn may rebut it simply by producing some evidence that it had legitimate, nondiscriminatory reasons for the decision." *Id.* If the defendant carries this burden of production, the burden then shifts back and "the plaintiff must prove by a preponderance of all the evidence in the case that the legitimate reasons offered by the defendant were a pretext for discrimination." *Id.*

"[M]ost of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause . . . and the factors justifying summary judgment dismissing [plaintiff's] Title VII claim against . . . municipal defendants for termination of his employment equally support the summary dismissal of his claims for termination brought under 42 U.S.C. §§ 1981 and 1983." *Patterson v. Cnty. Of Oneida, New York*, 375 F.3d 206, 226 (2d Cir. 2004) (citations omitted); *see also Cotterell v. Gilmore*, 64 F. Supp. 3d 406, 421 (E.D.N.Y. 2014) (holding that claims brought pursuant to the NYSHRL are also analyzed under this burden-shifting approach).[37] However, "in certain circumstances a Title

---

[37] The Second Circuit recently held that "§ 1981 does not provide a separate private right of action against state actors." *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018). The Second Circuit reasoned that, "[b]ecause § 1983 already provides a remedy against state actors, there is no reason to infer from the rights-conferring language of § 1981(c) that it creates an additional, and duplicative remedy." *Duplan*, 888 F.3d at 620-21. As a result, the Court liberally construes Claims One and Two as being brought under § 1983.

VII claim may be established through proof of a defendant's mere negligence, without a showing

of discriminatory intent . . . [whereas], a plaintiff pursuing a claimed . . . denial of equal

protection under § 1983 must show that the discrimination was intentional." *Patterson*, 375 F.3d

at 226 (citations omitted).[38]

Plaintiffs have failed to respond to Defendants' arguments challenging Plaintiffs'

disparate-treatment claims based on grounds other than their untimeliness. (*See generally* Dkt.

No. 43.) As set forth above in Part II. of this Decision and Order, in this District, when a non-

movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard

to that argument is lightened, such that, in order to succeed on that argument, the movant need

only show that the argument possesses facial merit, which has appropriately been characterized

as a "modest" burden. N.D.N.Y. L.R. 7.1(b)(3).[39]

Here, Defendants have shown that their argument possesses facial merit for the reasons

stated in their motion papers. The Court would add only that Defendants' arguments would

survive the more-rigorous scrutiny appropriate for contested arguments.

---

[38]     In addition, "[i]ndividuals are not subject to liability under Title VII." *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000); *see also Patterson v. Cnty. Of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (holding that the district court properly dismissed plaintiff's Title VII claims against the individual defendants); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) ("[I]ndividual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII."), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

[39]     Alternatively, the Court can, and does, deem the challenged claims abandoned (regardless of the facial merit of the unresponded-to argument). *See Jackson v. Fed. Exp.*, 776 F.3d 189, 197-98 (2d Cir. 2014) ("Where a partial response to a motion is made-i.e. referencing some claims or defenses but not others-a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned. In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review. This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

### 1. Failure to Promote

Plaintiff Lacey was the only Plaintiff who scored well enough to be reachable for a promotion after a civil service exam, in 2002. (Dkt. No. 38, Attach. 28 at ¶ 18.) The list generated from that exam expired in 2007. (*Id.*) Even assuming *arguendo* that Plaintiffs could establish that the continuing-violation doctrine applied and thus that Plaintiff Lacey's failure-to-promote claim is timely, Defendants presented a legitimate, non-discriminatory reason that Plaintiff Lacey was passed over for the promotion: as set forth above in Part I.B. ¶¶ 119-125 of this Decision and Order, Plaintiff Lacey was (voluntarily) disciplined for stealing gas from the County while the promotional list was pending. Plaintiffs have failed to present admissible evidence that Defendants' reason was actually pre-textual.

### 2. Discriminatory Job Assignments

Plaintiffs acknowledged that they are abandoning their claims with regard to individual Plaintiff's job assignments. (Dkt. No. 43, at 6.)

### 3. Discriminatory Discipline

Plaintiffs cite the deposition testimony of Plaintiff James to support their claim of disparate discipline. (Dkt. No. 43, at 10.) Plaintiff James' testimony is hearsay and inadmissible for purposes of this motion. (Dkt. No. 38, Attach. 15, at 19-31, 36-38, 58-59.) Plaintiff James admitted that he had not reviewed the personnel files of any of the alleged comparators. (Dkt. No. 38, Attach. 15, at 19.) Plaintiffs also presented an alleged post from Sergant Polacco's Facebook page from 2017, and an alleged post from Officer Cantwell's Facebook page. (Dkt. No. 44, Attachs. 1, 2.) Plaintiffs presented no foundation and these exhibits are unsworn out-of-Court statements, that are also inadmissible hearsay for purposes of this motion. The only admissible comparator presented by Plaintiffs is Sergeant Polacco, who used the term "colored

girl" in 2015, and was subsequently counseled and the incident was investigated. (*See generally* Dkt. No. 43.)

Plaintiff James has never been disciplined. (Dkt. No. 38, Attach. 15, at 17.) Plaintiff Lancaster has never been disciplined. (Dkt. No. 38, Attach. 18, at 37-38.) Plaintiff Brodhead was suspended once in 2010 after being charged with endangering the welfare of a child. (Dkt. No. 38, Attach. 16, at 45.) Plaintiff Lacey was suspended two times, once in 2006, for stealing gas from the County and once in 2007, after being charged with a crime related to a domestic incident. (Dkt. No. 28, Attach. 17, at 30-32.)

Even assuming *arguendo* that Plaintiffs could establish that the continuing-violation doctrine applies and thus that Plaintiffs Brodhead and Lacey's discriminatory-discipline claims were timely, their claims of disparate discipline still fail. The only non-hearsay comparator, Sergeant Polacco, is not comparable with Plaintiffs Brodhead and Lacey, who were disciplined after arrests for alleged crimes.[40] It is also worth noting that Plaintiffs Brodhead and Lacey voluntarily accepted their suspensions, upon the advice of their union representatives, in settlement of the disciplinary charges against them. (Dkt. No. 38, Attach. 16, at 45; Dkt. No. 38, Attach. 17, at 35-37, 44-50.) *See also Martinez v. Conn., State Library*, 817 F. Supp. 2d 28, 40 (D. Conn. 2011) (holding that where the plaintiff elected the level of discipline she received, her role should undermine a conclusion that the defendant took an adverse employment action against her).

---

[40]    The Court notes that, use of the term "colored" is not politically correct, it does not appear (without more) to be evidence of racial animus. *See Alex v. Gen. Elec. Co.*, 149 F. Supp. 3d 253, 284 (N.D.N.Y. 2016) (Suddaby, C.J.) (holding that there was no admissible evidence that defendant's use of the term "woman of color" to refer to plaintiff even when "coupled with the expression of a desire to 'grab her neck and slam her against the wall' along with a dislike of Obama and one or more references to Miss Piggy," was more indicative of racial animus than of a personality conflict); *Sweezer v. Michigan Dep't of Corr.*, 229 F.3d 1154, at *5 (6th Cir. 2000) (finding that use of the term "colored woman," even when followed by use of the terms "n-----" and "bitch," were "more indicative of a personality conflict than of racial animus").

In addition, Plaintiffs point to the suspension of now-Sergeant Wranovics sometime in 2002-2004 to support their claim of disparate discipline.  (Dkt. No. 43, at 10.)  However, just like Plaintiffs Brodhead and Lacey, Sergeant Wranovics was suspended for 30 days after being arrested for an alleged crime.  (Dkt. No. 38, Attach. 21, at 159.)

With regard to Plaintiff Ross, the Court notes that he voluntarily resigned from his position in the Sheriff's Office before his disciplinary charges could ever be heard or discipline imposed.  (Dkt. No. 38, Attach. 19, at 40, 57-59.)  For the reasons set forth by Defendants in the memoranda of law, the Court finds that Plaintiff Ross's resignation was not a constructive termination.

Finally, the Court finds that non-punitive written and verbal reprimands do not constitute a significant change in employment status and are not considered materially adverse actions. *Lawrence v. Thomson Learning, Inc.*, 05-CV-0329, 2007 WL 1593270, at *23 (N.D.N.Y. 2007) (Treece, M.J.) (collecting cases).

Therefore, Plaintiffs' claims involving disparate discipline fail.

### 4.  Other Allegations

Plaintiffs assert several other alleged instances of discriminatory disparate treatment. However, as set forth in Defendants' memoranda of law, these allegations were not adverse employment actions and Plaintiffs do not present any evidence of discriminatory intent.  (Dkt. No. 38, Attach. 41 [Defs.' Mem. of Law]; Dkt. No. 47, Attach. 1 [Defs.' Reply Mem. of Law].)

For all of these reasons, the Court grants Defendants' motion for summary judgment with regard to Counts One, Four, Six, and Seven.

### B. Plaintiffs' Hostile-Work-Environment Claims (Counts Two and Five)

After carefully considering the matter, the Court grants Defendants' motion for summary judgment regarding Plaintiffs' hostile-work-environment claims, for the reasons stated in Defendants' memoranda of law, including their arguments of untimeliness. (Dkt. No. 38, Attach. 41 [Defs.' Mem. of Law]; Dkt. No. 47, Attach. 1 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis, which is intended to supplement but not supplant Defendants' arguments.

"In general, to prevail on a hostile work environment claim, a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cotterell,* 64 F. Supp. 3d at 432-33 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 [2d Cir. 2000]). Further, "[w]hile single incidents of harassment generally do not create a hostile work environment, a plaintiff may nevertheless avoid summary judgment in a case involving a single instance of harassment by showing that it was 'extraordinarily severe.'" *Id.* (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 [2d Cir. 2000]). Moreover, "an adverse employment action is not required to sustain a hostile work environment claim." *Id.* (citing *Raniola v. Bratton*, 243 F.3d 610, 617 [2d Cir. 2001] ["Whereas other disparate treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile work environment claim analy[zes] a workplace environment as a whole."]; *cf. Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 [1993] [a hostile work environment claim does not require demonstration of an "injury"]).

For the reasons set forth in Defendants' memoranda of law, the Court finds that Plaintiffs have failed to adduce admissible evidence of severe and pervasive conduct required to maintain a hostile work environment cause of action. (Dkt. No. 38, Attach. 41 [Defs.' Mem. of Law]; Dkt.

No. 47, Attach. 1 [Defs.' Reply Mem. of Law].)  In addition, as identified in Defendants' memoranda of law, there is no evidence of a race-based motive for the race-neutral allegations set forth by Plaintiffs in support of their claims.  (*Id.*)  Moreover, for the reasons set forth in Defendants' memoranda of law, there is no basis to impute to Defendants the conduct that Plaintiffs allege.  (*Id.*)

For all of these reasons, the Court grants Defendants' motion for summary judgment with regard to Counts Two and Five.

### C.      Plaintiffs' Deprivation-of-Rights Claim (Count Three)

After carefully considering the matter, the Court grants Defendants' motion for summary judgment regarding Plaintiffs' deprivation-of-rights claim, for the reasons stated in Defendants' memoranda of law, including untimeliness, lack of personal involvement, lack of adverse employment action, lack of racial animus, and lack of a municipal custom, policy or practice. (Dkt. No. 38, Attach. 41 [Defs.' Mem. of Law]; Dkt. No. 47, Attach. 1 [Defs.' Reply Mem. of Law].)  To those reasons, the Court adds only one point, which is intended to supplement but not supplant Defendants' arguments.

Plaintiffs' third cause of action appears to be duplicative of their first cause of action (disparate treatment pursuant to 42 U.S.C. §§ 1981 and 1983).  As a result, the Court dismisses Plaintiffs' third claim for the reasons set forth above in Part III.A. of this Decision and Order.

For all of these reasons, the Court grants Defendants' motion for summary judgment with regard to Count Three.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 38) is

**<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiffs' Amended Complaint (Dkt. No. 25) is **<u>DISMISSED</u>**; and it is

further

     **ORDERED** that the Clerk of the Court shall close this action.

Dated:       September 26, 2018
             Syracuse, NY

                                        Hon. Glenn T. Suddaby
                                        Chief U.S. District Judge